UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

HAUCK MANUFACTURING          )
COMPANY,                     )
                             )
                Plaintiff,   )
                             )        No. 1:03-CV-166
v.                           )
                             )        Judge Curtis L. Collier
ASTEC INDUSTRIES, INC.,      )
ASTEC, INC., BRUCE IRWIN,    )
                             )
                Defendants.  )

# **M E M O R A N D U M**

Following an adverse jury verdict in a lengthy, highly contested trial, Plaintiff Hauck

Manufacturing Company[1] ("Plaintiff") filed a motion for a new trial (Court File No. 329)

accompanied by a supporting memorandum of law (Court File No. 330). Defendants Astec

Industries, Inc.,[2] and Astec, Inc.[3] (collectively, "Astec"), and Defendant Bruce Irwin filed a joint

motion seeking leave to file a single responsive brief in excess of the 25-page limit imposed by E.D.

Tenn. LR 7.1(b) (Court File No. 347) and a motion for leave to file a late exhibit (Court File No.

349). Astec then filed a 41-page response brief (Court File No. 348) and Irwin filed a brief response

formally adopting the brief submitted by Astec (Court File No. 350). Finally, Plaintiff filed a reply

brief in further support of its motion (Court File No. 364).

---

[1]http://www.hauckmfg.com

[2]http://www.astecindustries.com

[3]http://www.astecinc.com

As has been the case throughout this litigation, counsel for all parties have advocated their respective cases with much vigor and commendable skill. Regardless of the outcome, all parties should be very pleased with the high quality of representation afforded them. In part because of the high quality of the advocacy this has been an exceedingly difficult motion for the Court to decide.

After considering Plaintiff's motion, the arguments advanced by Plaintiff and Defendants, and the applicable law, the Court will **GRANT** Defendants' joint motion to exceed the page limit (Court File No. 347), **GRANT** Astec's motion to file a late exhibit (Court File No. 349), and **GRANT IN PART** and **DENY IN PART** Plaintiff's motion for a new trial (Court File No. 329).

## I.      STANDARD OF REVIEW

The parties are in agreement with respect to the standard of review that applies. Under the Federal Rules of Civil Procedure, a court may set aside a jury verdict and grant a new trial "to all or any of the parties and on all or part of the issues . . . for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). Courts have generally interpreted this language to allow a new trial when a jury has reached a "seriously erroneous result," which may occur when (1) the verdict is against the weight of the evidence; (2) the damages awarded are excessive; or (3) the trial was unfair to the moving party in some fashion (*i.e.*, the proceedings were influenced by prejudice or bias). *See Holmes v. City of Massillon,* 78 F.3d 1041, 1045-46 (6th Cir. 1996). The burden of demonstrating the necessity of a new trial is on the moving party, *Clarksville-Montgomery County Sch. Sys v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991), and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court. *See Anchor v. O'Toole*, 94 F.3d 1014, 1021

(6th Cir. 1996); *Davis v. Jellico Cmty. Hosp., Inc.*, 912 F.2d 129, 133 (6th Cir. 1990) (limiting a court's responsibility to preventing an injustice); *Browne v. Signal Mountain Nursery*, 286 F.Supp. 2d 904, 908 (E.D. Tenn. 2003).


## II.  RELEVANT FACTS & PROCEDURE

Of the three grounds for a new trial stated above, Plaintiff is principally relying upon the first, *i.e.*, the verdict was against the weight of the evidence.  Because under this ground the Court is required to assess and weigh the evidence presented at trial and determine whether the jury could reasonably have returned the verdict it did, the Court will confine the instant factual recitation to those general matters which in the Court's estimation remain undisputed.  Plaintiff, a New York corporation with its principal place of business located in Cleona, Pennsylvania, is one of the world's leading designers and manufacturers of combustion burners for use in industrial applications including the drying of aggregate in the asphalt-mixing process.  Plaintiff has a number of product lines designed for asphalt plant applications, including the StarJet burner and the EcoStar series of "sealed-in" burners.  The companies collectively referred to herein as "Astec" are both Tennessee corporations with their principal places of business located in Chattanooga, Tennessee.  Astec is engaged in the business of designing, manufacturing, and marketing temporary and permanent hot-mix asphalt plants.  Prior to the present litigation, Astec had purchased burners from Plaintiff since 1972 for use in its products.  During the early 1990s, Astec developed a single low NOx burner for use in a paving project in California but was not otherwise directly engaged in the business of developing or producing burners prior to 2001.

The instant litigation arises out of the events and circumstances surrounding Defendant

3

Irwin's change of employment in 2001. Irwin was employed by Plaintiff beginning in 1988 as an engineering manager and later moved into sales application engineering. In January 2001, Irwin approached Astec about the possibility of hiring him and going into the burner business in competition with Plaintiff. During the months that followed, Irwin communicated back and forth with Astec about the particulars of his employment and provided certain information to Astec with an eye toward the commencement of a burner project. On April 22, 2001, Irwin formally accepted an offer to serve as head of Astec's burner development project. Irwin was the only applicant considered by Astec and the only person interviewed for the position. Irwin continued to work for Plaintiff throughout the course of his discussions with Astec and never disclosed to Plaintiff the fact of his negotiations with Astec, Astec's offer of employment, Irwin's acceptance thereof, or any other details of his dealings with Astec.

Irwin finally gave Plaintiff notice of his intention to leave on June 22, 2001, and officially began work for Astec on July 16, 2001. At Astec, Irwin was charged with responsibility for directing the company's burner development group, Flametec,[4] which eventually resulted in the development and production of the WhisperJet burner. After the WhisperJet appeared on the market, Plaintiff developed suspicions and made inquiries of Astec. As a result of these inquiries, on March 17, 2003, Astec returned to Plaintiff a number of drawings, documents, and computer files which had apparently been found in Irwin's possession. At trial and throughout the instant litigation, Plaintiff's general theory of the case has been that Irwin intentionally stole or otherwise took Plaintiff's trade secrets both at the time of and in the months leading up to his change of

---

[4]Flametec was a new division whose creation generally coincided with Astec's hiring of Irwin. The division's sole purpose was to design and produce an industrial burner.

employment.  Plaintiff has further contended Astec knew about and was complicit in Irwin's activities and, in any event, Astec knowingly used or benefitted from the information.

Plaintiff filed its original complaint on May 9, 2003,[5] asserting claims for misappropriation of trade secrets (Count I) and unjust enrichment (Count IX) against both Astec and Irwin; claims for breach of contract (Count II), breach of duty of loyalty (Count VI), civil conspiracy (Count VII), and conversion (Count VIII) against Irwin; and claims for tortious interference with contract (Count IV), unlawful procurement of breach of contract in violation of Tenn. Code Ann. § 47-50-109 (Count V), civil conspiracy (Count VII), and conversion (Count VIII) against Astec (*see* Court File Nos. 1, 91). On August 26, 2003, following a nine-day evidentiary hearing, the Court entered a preliminary injunction restraining and enjoining Astec and Irwin from selling, marketing, manufacturing, or using its WhisperJet burner until a trial on the merits in this matter (Court File No. 69).  Astec fired Irwin that same day (Tr. at 834-35).[6]

Astec then filed a motion to dismiss certain of Plaintiff's claims as preempted by the Uniform Trade Secrets Act ("UTSA") as adopted in Tennessee.  On October 14, 2004, the Court entered a Memorandum and Order granting that motion in part and dismissing Plaintiff's claims against Astec for civil conspiracy, conversion, and unjust enrichment (Court File Nos. 253, 254). *See Hauck Mfg. Co. v. Astec Indus., Inc.*, --- F. Supp. 2d ----, 2004 WL 3403148 (E.D. Tenn. Oct. 14, 2004).  The Court further dismissed Plaintiff's claims for tortious interference with contract and

---

[5]Plaintiff later sought and received permission to file an amended complaint adding claims against two additional defendants, Frank T. Y. Sun and Sun Valley Technology, Inc. (*see* Court File No. 91).  However, Plaintiff and the Sun Defendants settled these claims prior to the conclusion of the trial, therefore these claims and defendants are not specifically discussed in this Memorandum.

[6]All citations to transcripts and exhibits refer to the trial of this matter and no other proceedings.

unlawful procurement of breach of contract to the extent those claims were premised on alleged breaches of a confidentiality agreement between Plaintiff and Irwin, but denied the motion to the extent those claims were based upon an alleged breach of the conflict of interest agreement between Plaintiff and Irwin. *Id.*

The trial of this matter commenced on October 25, 2004 and continued over the course of twenty trial days spanning a period of approximately one and a half months. The parties offered the testimony of numerous witness, introduced a wide variety of documents into evidence, and used numerous demonstrative exhibits. At the conclusion of proof, the Court held a charge conference. The Court was able to resolve all matters related to the instructions to the jury, but issues remained as to the portion of the verdict form relating to damages. At this point, the Court, with the agreement of the parties, elected to instruct the jury and present them a partial verdict form so they could begin their deliberations with the idea the final verdict form containing the agreed upon damages portion would be provided to the jury later. After charging the jury, the Court then sought to tackle the issues relating to the remainder of the verdict form. Following extended argument and a number of draft proposals, the parties and the Court finally agreed upon a complete verdict form. However, a previous interim draft version of the verdict form was inadvertently provided to the jury rather than the final version. This error later came to the Court's attention as a result of an inquiry by the jury and the jury was then provided with the correct version and instructed to return to its deliberations and ignore the previous version they had been given. Astec and Irwin both made objections and moved for a mistrial. The Court denied those motions and the jury returned a verdict in favor of Plaintiff and against Irwin on the breach of contract and duty of loyalty claims but in favor of Irwin and Astec on all other claims (Court File No. 325). The jury awarded Plaintiff

compensatory damages in the amount of $0 for Irwin's breach of the confidentiality provisions of his employment agreement, $10,860 for his breach of his conflict of interest agreement, and $10,860 for his breach of the duty of loyalty, for a total of $21,720 (*id.* ¶¶ 10, 12-14).

III.   **DISCUSSION**

A.   **Preliminary Matters**

Astec and Irwin filed a joint motion to exceed the 25-page limit imposed by E.D. Tenn. LR 7.1(b) proposing the defendants file a single brief in excess of the page limit rather than each defendant taking advantage of its own individual right to file a 25-page brief (Court File No. 347). In the interests of efficiency and there being no objection from Plaintiff, the Court will **GRANT** Defendants' motion (Court File No. 347) and will consider the entirety of Astec's 41-page brief (Court File No. 348).

Additionally, shortly after filing its motion for new trial and supporting memorandum, Astec filed a motion for leave to file a late exhibit (Court File No. 349). The late exhibit offered by Astec is a clean copy of the written version of the agreed upon jury charge which is to replace the marked-up copy submitted with Astec's motion. The Court is careful to note this is not an excerpt of the transcript of the Court's instructions to the jury, but rather the document reflecting the charging language to which the parties and the Court agreed. There being no objection and so as to create a complete record, the Court will also **GRANT** this motion (Court File No. 349).

B.   **Inconsistency of Jury's Verdict**

Plaintiff first contends the jury's verdict is internally inconsistent, thus necessitating a new trial (Court File No. 330, pp. 5-7). "[W]here verdicts in the same case are inconsistent on their

7

faces, indicating that the jury was either in a state of confusion or abused its power, a motion . . . for new trial . . . if timely made, is not discretionary." *Hopkins v. Coen*, 431 F.2d 1055, 1059 (6th Cir. 1970); *see also United States ex rel. A±Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 457 (6th Cir. 2005). Plaintiff contends the jury's failure to find any of the defendants liable for misappropriating Plaintiff's trade secrets (Court File No. 325, ¶ 1) is contrary to and inconsistent with its conclusion Plaintiff had proven by a preponderance of the evidence Irwin breached the confidentiality provisions of his employment agreement (Court File No. 325, ¶ 4). The pertinent portion of Irwin's employment agreement with Plaintiff reads as follows:

> I further agree that during and after such employment, I will not divulge or appropriate to my own use or to the use of others, except as HAUCK may authorize or direct, any secret or confidential information or knowledge obtained by me or disclosed to me during my employment by HAUCK.

(Trial Exh. No. 1000). Plaintiff contends the answers to Questions 1 and 4 on the verdict form demonstrate a lack of understanding on the part of the jury because it is impossible to "divulge or appropriate . . . secret or confidential information or knowledge" (as the jury had to find in order to hold Irwin liable for breach of contract) without also misappropriating trade secrets. Stated another way, Plaintiff contends a breach of the confidentiality provisions would necessarily amount to a misappropriation of trade secrets and *vice versa*, therefore, the jury rendered inconsistent verdicts in concluding Plaintiff had proven the former and not the latter.

Although there is considerable force and some merit to Plaintiff's argument on this point, the Court ultimately is not persuaded. When faced with a claim that a verdict is inconsistent, the Court should "look for a reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 509 (6th Cir. 1998); *see also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355,

364, 82 S. Ct. 780, 786, 7 L. Ed. 2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."). Viewing the facts of this case and the Court's instructions to the jury as a whole, the Court cannot conclude there is an inherent inconsistency in the jury's responses to Questions 1 and 4 on the verdict form. Even assuming the "act" component necessary to a finding of liability on the breach of contract claim (*i.e.*, divulged or appropriated) would by definition amount to "misappropriation," the two claims require different findings with respect to the nature of the object of that action. In order to prove its breach of contract claim, Plaintiff had only to prove Irwin divulged or appropriated "any secret or confidential information or knowledge" obtained during his employment. In order to prevail on its trade secret claim, however, Plaintiff had to prove the information Irwin misappropriated had been "subject to reasonable efforts under the circumstances to maintain its secrecy" and "derive[d] independent economic value, whether actual or potential, from not being generally known to or readily ascertainable by others who [could] obtain economic value from it" (Charge to the Jury, pp. 21, 23). *See* Tenn. Code Ann. § 47-25-1702(4). Although secrecy is a basic element of the existence of a trade secret, the fact that particular information may be unknown to others and/or may have been deemed "secret" or "confidential" by its owner does not necessarily mean that information will qualify as a trade secret. Trade secret status specifically requires a plaintiff to additionally demonstrate the information is not readily ascertainable by others and derives independent economic value from its secrecy. While this may be a fine line, it is a significant one and the Court is compelled to reconcile the jury's verdicts where possible. *See Gallick v. Baltimore & O.R. Co.*, 372 U.S. 108, 119, 83 S. Ct. 659, 666, 9 L. Ed. 2d 618 (1963) ("[I]t is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them . . . . We

9

therefore must attempt to reconcile the jury's findings, by exegesis if necessary, before we are free to disregard the jury's special verdict and remand the case for a new trial."); *see also United States v. Alpine Indus., Inc.*, 352 F.3d 1017, 1026 (6th Cir. 2003) ("When requested, a trial court faced with an apparent inconsistency between a jury's answers and the court's instructions must attempt to reconcile the two.").  Further, although the jury did find Irwin had breached the confidentiality provisions of his employment agreement, it declined to award Plaintiff any damages for that breach (Court File No. 325, ¶ 13), thus strongly implying the jury did not believe the information Irwin stole had any independent economic value, whether or not derived from its secrecy.

Plaintiff also makes reference to the Court's previous ruling on Astec's motion to dismiss (Court File No. 330, p. 7).  Therein, the Court held certain of Plaintiff's claims against Astec were preempted by Tennessee's adoption of the UTSA in part because the UTSA has been interpreted "to abolish all free-standing alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information falling short of trade secret status (*e.g.*, idea misappropriation, information piracy, theft of commercial information, *etc.*)."  *Hauck*, 2004 WL 3403148, at *5. Plaintiff contends this holding either implies or compels the conclusion Irwin could not have breached his confidentiality agreement without also misappropriating trade secrets.  As a legal matter, the Court's previous holding does not make liability for breach of a confidentiality agreement contingent upon proof of misappropriation of a trade secret.  Rather, the Court simply concluded "the UTSA would appear to occupy the field and create a single class of commercially valuable intangible property which the law protects *as such*."  *Id.* (emphasis added).  Accordingly, Plaintiff could not maintain actions for conversion or tortious interference against Astec based upon an alleged theft of information which, though secret and/or confidential to one degree or another,

falls short of qualifying for trade secret status. Nothing in the Court's ruling in any way suggests such information does not exist or that it could not be protected through contractual methods, as explicitly contemplated by the UTSA itself. *See* Tenn. Code Ann. § 47-25-1708(b)(1). Thus, a conclusion Irwin breached his confidentiality agreement would not necessarily compel the conclusion Irwin (or Astec) misappropriated Plaintiff's trade secrets.

It is true, however, the Court's ultimate finding that Plaintiff's tortious interference and unlawful procurement claims were preempted to the extent they were premised upon Irwin's alleged breach of the confidentiality provisions of his employment agreement rested on a finding those claims were "based upon misappropriation of a trade secret." *See Hauck*, 2004 WL 3403148, at *8. Thus, by implication, a conclusion Irwin breached his confidentiality agreement as alleged by Plaintiff and characterized by the Court would necessarily amount to a conclusion Irwin also misappropriated trade secrets. Nevertheless, the jury's interpretation of the facts ultimately trumps that of the Court and the Court's instructions to the jury in no way suggested the jury had to conclude Irwin divulged or appropriated trade secrets in order to find he had breached his confidentiality agreement. Moreover, in ruling on the motion to dismiss the Court was compelled to accept Plaintiff's factual allegations as true and assume all of the information Plaintiff sought to protect qualified for trade secret protection. The jury, of course, was free to accept or reject Plaintiff's proof and reach different conclusions regarding whether the information was protected as trade secrets. Thus, because the Court finds no inherent inconsistency in the verdicts rendered by the jury, the Court will **DENY** Plaintiff's motion for a new trial on this ground.

C.      **Against Weight of the Evidence**

Plaintiff's primary argument contends the jury ignored the clear weight of the evidence in

finding in Astec's favor on Plaintiff's trade secret misappropriation, tortious interference with contract, and unlawful procurement of breach of contract claims; in Irwin's favor on Plaintiff's trade secret misappropriation claims; and by finding Irwin had not breached his duty of loyalty to Plaintiff intentionally, fraudulently, maliciously, or recklessly (Court File No. 330, pp. 7-16). Astec counters by arguing the jury's verdict was based upon a reasonable interpretation of the evidence and should be allowed to stand (Court File No. 348, pp. 8-37). When ruling on a new trial motion claiming the verdict was against the weight of the evidence, the district court should "'compare the opposing proofs and weigh the evidence.'" *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000) (quoting *Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir. 1984)); *see also J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991). The Court should deny the motion and leave the jury's verdict undisturbed so long as it "could reasonably have been reached." *See Conte*, 215 F.3d at 637-38. Thus, a motion for a new trial should be denied "if the verdict is one that reasonably could be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." *Mosely v. Kelly*, 65 F.Supp. 2d 725, 739 (E.D. Tenn. 1999), quoting *Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 796 (6th Cir. 1996). A jury's verdict "should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." *J.C. Wyckoff*, 936 F.2d at 1487. Rather, the Court must compare the offered evidence and set aside the jury's verdict only if it is against the clear weight of the evidence as a whole. *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 818 (6th Cir. 1999) (citing *Tobin v. Astra Pharm. Prod.*, 993 F.2d 528, 541 (6th Cir. 1993)). Applying this standard, the Court will now address the evidence as to each of Plaintiff's claims in turn.

1. **<u>Misappropriation of Trade Secrets</u>**

In order to prevail on its trade secret claim, Plaintiff was required to show by a preponderance of the evidence first that it had a trade secret(s), that is, information which "derives independent economic value, whether actual or potential, from not being generally known to or readily ascertainable by others who [could] obtain economic value from it" and had been "subject to reasonable efforts under the circumstances to maintain its secrecy" (Charge to the Jury, pp. 21, 23). *See* Tenn. Code Ann. § 47-25-1702(4). Second, Plaintiff was required to prove Irwin and/or Astec misappropriated that trade secret, that is, acquired or gained knowledge of the secret from another "know[ing] or [having] reason to know that the trade secret was acquired by improper means" or used or disclosed the trade secret without consent after having "obtained knowledge of the trade secret by improper means or under circumstances giving rise to a duty to maintain its secrecy or limit its use" or "from another person . . . knowing or having reason to know that person had acquired it by improper means or owed a duty to the plaintiff to maintain its secrecy or limit its use" (Charge to the Jury, p. 28). *See* Tenn. Code Ann. § 47-25-1702(2). The Court defined "improper means" as the acquisition of information "by theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means" or by "false pretenses" (Charge to the Jury, p. 28). *See* Tenn. Code Ann. § 47-25-1702(1).

As to the first element of its USTA claim (*i.e.*, existence of a trade secret), Plaintiff has generally alleged throughout the litigation Defendants misappropriated a wide range of its technical and commercial trade secrets, including manufacturing and assembly drawings, design ideas, specific EcoStar II components, confidential part numbers, material and labor cost data, products

13

and data for a particular client (All American Asphalt), and budget and test data. In conjunction

with the instant motion, Plaintiff has provided a detailed list of the specific trade secrets it alleges

Irwin and Astec misappropriated, a list which includes at least fifty-one different items, documents,

and/or concepts (Court File No. 330, Exh. 3). Plaintiff provided a similar but shorter list of

approximately fifteen items during discovery in response to Defendants' interrogatories (*see* Court

File No. 141, Exh. 5). Plaintiff did not, however, provide the jury with such a list at trial, but one

of its primary witnesses, John A. Marino (Plaintiff's senior vice president for technology and

business development), did generally testify as to the confidential and proprietary nature of a host

of different types of information, including information about Plaintiff's research and development

process (Tr. at 145), manufacturing drawings (Tr. at 159-60), general know-how as to service and

emissions testing (Tr. at 167-68), Plaintiff's discount schedule (Tr. at 169-70), production costs (Tr.

at 171), labor requirements for burner production (Tr. at 217-18, 273), a computer program used in

servicing burners (Tr. at 235-36), material costs (Tr. at 273), and internal part numbers (Tr. at 204-

09, 547). Additionally, Irwin testified both Plaintiff and Astec regarded manufacturing drawings

and certain financial information as confidential and proprietary (Tr. at 624-25, 695-96) and Don

Brock, Astec, Inc.'s CEO and chairman of its board of directors and president of Astec Industries,

Inc., testified Astec considers its own manufacturing drawings, costing, and labor hour requirements

to be confidential and proprietary information (Tr. at 1943-45).

Marino testified Plaintiff considered all of this information proprietary and made efforts to

keep it strictly confidential. Specifically, Marino testified Plaintiff maintained limited access and

password-protected computer systems, kept files under lock and key, had a building security system,

marked drawings as "confidential and proprietary," required employees to sign confidentiality

agreements, adopted security policies, and set those policies out in a manual (Tr. at 172-76, 1266-67). When asked, Irwin admitted some of Plaintiff's cost information he had used or referenced in his communications with and work for Astec was regarded by Plaintiff as proprietary and confidential, including labor and material cost data and manufacturing drawings (Tr. at 695-96, 700-01, 764-65). Irwin also testified it "would be normal" for Plaintiff to have consultants working with the company on development sign confidentiality agreements but stated it "was kind of a rare thing" to use consultants (Tr. at 783, 784-85). Irwin denied that Plaintiff considered certain types of information proprietary and confidential (*e.g.*, per hour labor costs) but conceded these items of financial information were nonetheless covered by the confidentiality provisions of his employment agreement (Tr. at 698-700). In challenging Irwin's denials, Plaintiff introduced a September 5, 2000 e-mail from Irwin to Brad Smith, Plaintiff's sales manager, attached to which is a spreadsheet document summarizing Astec's orders from 1999 through July 2000 and the effect thereon of certain pricing changes being implemented by Plaintiff (Exh. 1265; Tr. at 703-06). In this e-mail, Irwin specifically instructs Smith to delete the column providing Plaintiff's cost information before sending the document to Astec (*id.*).

Astec generally sought to counter Plaintiff's trade secret allegations by proving the information for which Plaintiff claimed trade secret status was, in fact, readily available to Astec and others through a variety of routes. Astec offered evidence regarding Plaintiff's annual three- and five-day asphalt service schools where it presents technical information to customers through cut-aways of burners, factory tours including the research and development lab, demonstrations, and manuals containing drawings stamped "confidential" including a control panel assembly drawing and a wiring diagram (Exh. 2026; Tr. at 349, 370-78, 381-85, 2011-12). Astec also offered

15

testimony and proof to the effect information regarding the EcoStar II was and is available to the general public on Plaintiff's website, including drawings containing certain dimensional information, drawings providing exterior geometry, cutouts of four different available atomizer nozzle versions, subassembly drawings, numbers for commercially available parts, a diagram of the pilot manifold, burner capacity and performance data, precise instructions for locating the atomizer nozzle in relation to the primary air tube, a detailed diagram of the compressed air manifold, and maintenance and set-up information (Exhs. 2021, 2022; Tr. at 351-59, 362-66). Additionally, password-protected sections of Plaintiff's website are made available to some customers, such as Astec, which provide access to service manuals, application data sheets, and other information geared toward "making [the] burner more useful to the customer in his service and his process" (Tr. at 353, 369-70). Further, Plaintiff produces a software program called "e-Solutions" which provides information, applications, and tools designed to facilitate "solving combustion and heat transfer problems" and can even "be used to make design decisions for combustion systems" (Exh. 2021A; Tr. at 366-69, 1997-98). Plaintiff makes this software available to its customers and offers it to the general public for a price of $295 (Tr. at 366-67, 369).

Marino testified no manufacturing drawings or internal part numbers were available through Plaintiff's website and/or service schools and one could not build a burner from the assorted information available from those sources (Tr. at 546-48). However, Michael Swanson,[7] an engineer employed by Astec, testified he could recreate the design of a piece depicted in a to-scale sales drawing in electronic CAD format because the dimensional information would be "embedded" in

---

[7]Michael Swanson testified he had only been an engineer for a short time and his first employment was with Astec. His father is Malcolm Swanson, Astec's head engineer.

the sales drawing (Tr. at 1142-44). Swanson stated he did not personally do this during the WhisperJet project (Tr. at 1144, 1159, 1161-62) but testified he would be able to "recreate . . . [p]robably 90, 95 percent" of a functional burner from a CD of electronic sales drawings and could have obtained the remainder of the needed information "from general engineering knowledge" or reverse engineering (Exh. 2001; Tr. 1144-58). Malcolm Swanson[8] also testified Astec did not use the CAD drawings in such a manner or that they ever had any intention of doing so but claimed they easily and legitimately could have (Tr. at 2410-17).

Astec also presented proof that over the course of their relationship, Plaintiff had directly provided Astec with information about burner design, configuration, and operation, including service and/or operations manuals, sales drawings (in both written and electronic formats), system schematics, bills of materials, parts lists, sales part numbers, emissions test results, performance data (*i.e.*, fuel capacity, spin setting, flame length, *etc.*), prices, and Plaintiff's price multiplier for Astec (Exhs. 2001, 2009, 2030, 20031, 2032, 2033, 2038, 2134, 2142, 2143, 2150, 2155, 2166, 2282, 2735; Tr. at 391-96, 1986-2007, 2017-23, 2348-50, 2477-78). Malcolm Swanson, Astec's head engineer, described the exchange of information between Plaintiff and Astec as "free-flowing" (Tr. at 1996) and claimed Astec had often provided significant design input which Plaintiff used in developing its products (Tr. at 2008-10, 2397-98). Irwin testified the EcoStar II was designed with Astec in mind and Plaintiff consulted with Astec at various stages of the design process and incorporated Astec's suggestions (Tr. at 407-12). James Feese, an engineer employed by Plaintiff, testified none of Astec's contributions to the EcoStar II project affected the burner's "functionality" and were not what he would consider "significant design input" (Tr. at 1188-89).

_____

[8]Malcolm Swanson is Astec's head engineer and the father of Michael Swanson.

In addition to design information, Astec also claimed Plaintiff had disclosed "end user pricing information" to Astec (Exhs. 2149, 2163; Tr. at 455-60, 2023-25) and Irwin himself, with Plaintiff's permission, sent Astec pricing information and Astec's multiplier while he was employed by Plaintiff (Exh. 2131; Tr. at 962-64). Beginning at least as early as November 27, 2000, Astec compiled pricing information provided by Plaintiff into its own spreadsheets (Exhs. 2363, 2364; Tr. at 2029-31, 2478). Malcolm Swanson further testified that although he had not actually seen Plaintiff's master discount schedule (Exh. 1018) prior to the instant litigation (Tr. at 2025), it would not have been useful because "[i]t didn't give us any information about the markets that we were interested in that we didn't already have" (Tr. at 2404-05). When asked, Swanson was unable to calculate the precise multiplier for the EcoStar II (or any other particular burner) from the price data made available to Astec and introduced into evidence (Tr. at 2406-10) but maintained the full complement of information disclosed by Plaintiff would have permitted such a calculation (Tr. at 2477-78).

Although a "confidential" stamp appears on many of the documents made available by Plaintiff (*see, e.g.*, Tr. at 360-62, 1160-68), Malcolm Swanson testified he was not aware of any conversations between the parties about those stamps and their meaning (Tr. at 2014-15). Michael Swanson maintained "Hauck had an understanding with Astec that the information traded between us was freely given without restriction," though he could not recall how or where he had learned of this agreement (Tr. at 1160-62, 1167-68).[9] For his part, Malcolm Swanson also claimed such activity was legitimate in light of both the way Plaintiff treated its material and the terms of a vendor confidentiality agreement between the parties (Tr. at 2414-17). Plaintiff and Astec entered into a

---

[9]No specific evidence of such an agreement was ever produced at trial.

vendor confidentiality agreement on September 21, 2001, which provided "any knowledge or information which Hauck discloses to Astec which in any way relates to the supply of products to Astec shall not be deemed to be proprietary or confidential information and shall be acquired by Astec free from any restrictions" (Exh. 2027; Tr. at 2031-38).[10] Michael Swanson conceded that, absent such an agreement or understanding, he "would be concerned about" extracting dimensional information imbedded in Plaintiff's electronic sales drawings or otherwise using materials bearing a restricted use block to develop a competing burner program (Tr. at 1168). Despite Plaintiff's assertions of confidentiality and claims of security measures, Marino admitted Plaintiff had no system in place to track the dissemination of information and, thus, had no way of knowing at any given time exactly what information it had given Astec (or any other customer) in the past (Tr. at 397).

In addition to contending the information from Plaintiff's manufacturing drawings was obtainable through electronic sales drawings and other sources of information made available to the public by Plaintiff, Astec also sought to prove Plaintiff's modified Delevan nozzle could have been reverse engineered. Particular emphasis was given to the evolution of this nozzle, likely because Irwin admitted to having directly used Plaintiff's manufacturing drawings in making a hand sketch of the modified Delevan nozzle used on the EcoStar II (including transcribing tolerance and dimensional data) in order to "design a modification of the oil nozzle" for the WhisperJet (Exhs.

---

[10]Admittedly, this vendor confidentiality agreement was entered into after Irwin had commenced his employment with Astec and, according to Plaintiff, begun misappropriating Plaintiff's trade secrets.

1050, 1051, 1052, 1053, 1069; Tr. at 745-46, 759-67, 819, 823; 928, 931-32, 1013).[11]  Irwin specifically admitted he did not reverse engineer Plaintiff's nozzle but maintained he should have done so or instructed someone else to (Tr. at 822-23, 924-27).  Astec noted Plaintiff's EcoStar II nozzle is commercially available, can be disassembled, and is itself a "redesigned and scaled up" modification of a Delavan nozzle (Exh. 2814; Tr. at 441-48).  Malcolm Swanson testified Astec routinely engages in reverse engineering and could easily have reverse engineered Plaintiff's nozzle (Tr. at 2277-79, 2311-13).  Don Brock, Astec, Inc.'s CEO and chairman of its board of directors and president of Astec Industries, Inc., claimed he could design, measure, and draw a nozzle in a day but that he could not insure that nozzle would work properly (Tr. at 1910-11).  Feese testified it took him somewhere in the range of "a couple of hours, couple of days" to measure and record the various dimensions on the Delavan nozzle, which he then used to create the modified Delavan nozzle on the EcoStar II (Tr. at 1427-28).

In connection with the instant litigation, Astec had Anderson Machine Company, Inc., reverse engineer the modified Delavan nozzle (Exhs. 2348, 2349, 2687; Tr. at 2279-88, 2729-55).  Edwin Yancey, a machinist for Anderson, testified it took him approximately fifteen and one-half (15½) hours to take the necessary dimensions and an additional seventy-eight and one-half (78½) hours to actually create a duplicate, for a total of about eleven days of work (Tr. at 2733, 2746-47).  Yancey charged Astec a little less than $5,000 for this work but testified he would have charged 25-30% less to produce further duplicates (Exh. 2687; Tr. at 2749-50).  One problem was detected on this reverse engineered nozzle and the pintle had to be remachined (Tr. at 2308-10, 2750-52, 2772-

---

[11]Irwin had possession of the actual Hauck manufacturing drawings of the nozzle but instead of simply using those drawings, Irwin made hand copies of Plaintiff's drawing thereby excising any connection to Hauck from the document.

74). It took Yancey "about 30 minutes" to do this (Tr. at 2752). Yancey testified Astec had

discovered the problem by taking the pintle of Plaintiff's nozzle and putting it on Yancey's (Tr. at

2773-74). Yancey admitted he had worked on fifteen to twenty various nozzles for Astec prior to

being asked to reverse engineer Plaintiff's nozzle and had actually built ten complete nozzles from

manufacturing drawings but maintained the nozzle he was asked to reverse engineer was "totally

different" (Tr. at 2766-70, 2777). Although Yancey's nozzle was subjected to water spray testing,

the nozzle was never tested on oil or in an actual WhisperJet (Tr. at 2632-33, 3090-92) and Yancey

conceded there could remain errors in the dimensions or machining of his nozzle (Tr. at 2775-76).

Having reviewed the evidence and considered the strengths and weaknesses of each side's

proof, the Court concludes it would not have been unreasonable for the jury to conclude Plaintiff

had failed to meet its burden of proof as to some or all of its purported trade secrets because the

information Plaintiff sought to protect was readily available either to Astec specifically or the public

generally and/or derived no independent economic value from whatever secrecy under which it was

held. Further, it would not have been unreasonable for the jury to credit Astec's reverse engineering

argument with respect to Astec's use of Plaintiff's modified Delevan nozzle. As the Court instructed

the jury,

> Reverse engineering is a process where a person starts with a known product and
> works backward to determine the secret process by which the product was designed,
> developed, or manufactured. This goes to whether or not the information claimed
> to be a trade secret was readily ascertainable. Even if a trade secret could potentially
> be discovered through reverse engineering but it would be expensive, difficult, time-
> consuming, impracticable, or for any other reason not a reasonably desirable option,
> then trade secret protection would still apply. One factor you may consider is
> whether those in the marketplace are actually reverse engineering the product. If the
> product is being reverse engineered, then this may suggest that it is a reasonably
> desirable option and the trade secret is readily ascertainable to others. On the other
> hand, if the product is not being reverse engineered, then you may consider this in
> determining whether reverse engineering is truly a reasonably desirable option and

the trade secret is readily ascertainable.

(Charge to Jury, pp. 26-27) (footnotes omitted); *see Wright Medical Tech., Inc. v. Grisoni*, 135

S.W.3d 561, 589 (Tenn. Ct. App. 2001); *Hickory Specialties, Inc. v. B&L Labs., Inc.*, 592 S.W.2d

583, 587 (Tenn. Ct. App. 1979). Whether a particular part or product may be readily and practicably

reverse engineered is a question of fact, and the law provides no specific tipping point in terms of

time, cost, or expertise beyond which reverse engineering is deemed impractical. While the

evidence clearly indicated there was some significant time and cost involved in reverse engineering

the EcoStar II's modified Delevan nozzle, it would not have been unreasonable for the jury to have

concluded from the evidence that reverse engineering is a viable option, thus depriving the details

of Plaintiff's manufacturing drawings of their trade secret status.

With respect to the second element of Plaintiff's trade secret claims (*i.e.*, misappropriation),

Plaintiff's argument centered on the collection of files, binders, notebooks, and catalogs returned

by Irwin/Astec on March 17, 2003, which contained StarJet, EcoStar, and Beta burner

manufacturing drawings, an annotated version of Plaintiff's master discount schedule (Exh. 1018),

Plaintiff's aggregate drying product price list (Exh. 1019), and a CD containing "hundreds" of

documents and/or files found on Irwin's ex-fiancée's home computer, including budgets, department

reports, financial data, test reports, drawings, design documents, correspondence, formulas, salary

and personnel information, business plans, and pricing information (Exhs. 1015, 1017; Tr. at 238-59,

804-06, 816-19). Marino described this collection as a complete "dump" of confidential information

"of any nature" by "a trusted member of [Plaintiff's] management team" (Tr. at 493) and claimed

Irwin "took everything that he could – had ever generated at Hauck in his years that he had a

computer" (Tr. at 246). Irwin sought to explain his actions by maintaining he had begun transferring

files to his home computer in the early 1990s for the sake of convenience (Tr. at 992-93) and pointed out Plaintiff's confidential drawings and documents had originally been placed in his catalogs for legitimate and proper reasons (Tr. at 996-1001, 1016-18). Additionally, Irwin claimed the information he had taken with him from Plaintiff remained boxed up in Pennsylvania and was not even moved to Tennessee until mid-August 2001, approximately one month after Irwin had begun work at Astec (Tr. at 889-91). In any event, none of these claims avoid the fact Irwin possessed the very information Plaintiff now claims constituted trade secrets. Having thus demonstrated Astec and Irwin *had* this information, Plaintiff sought to prove they *used* the information by both offering direct proof of alleged instances of misappropriation and asking the jury to infer misappropriation from certain suspicious facts and circumstances.

The primary instance of alleged misappropriation involving direct proof relates to the design of the modified Delevan nozzle initially used on WhisperJet. In his testimony, Irwin admitted having copied from Plaintiff's confidential manufacturing drawings in making his initial sketches for the WhisperJet (Exhs. 1050, 1051, 1052, 1053, 1069; Tr. at 745-46, 759-67, 819, 823; 928, 931-32, 1013), and every witness who was asked testified this was improper and/or unethical. Additionally, on May 7, 2002, Irwin caused Astec to submit a parts requisition to Plaintiff asking to purchase two specific nozzle parts Plaintiff did not offer for sale and referring to those parts with Plaintiff's confidential part numbers, numbers which Irwin admitted he obtained from Plaintiff's manufacturing drawings (Exh. 1002; Tr. at 204-07, 774-76, 943). Although Astec and its witnesses denied any knowledge of Irwin's activities, such ignorance does not affect Astec's liability since Irwin was undoubtedly acting within the scope of his employment in designing and developing the WhisperJet burner. However, even assuming it would have been unreasonable for the jury to

23

conclude Irwin and Astec did not misappropriate the information contained within Plaintiff's nozzle manufacturing drawings, it would not have been unreasonable, as noted above, for the jury to conclude Plaintiff had failed to prove that information was entitled to trade secret protection because it was readily available either through the information Plaintiff had disclosed or by reverse engineering.

In addition to the manufacturing drawings of Plaintiff's modified Delevan nozzle, Irwin also admitted to "looking at" an unspecified StarJet drawing in connection with Astec's work on an open-fired burner called the "FlameJet" in the Spring of 2002, after the WhisperJet had been introduced into the market (Tr. at 759-60). Irwin testified he created a sketch or hand drawing for the FlameJet project but could not recall whether he looked at the StarJet drawing in doing so (*id.*). In any event, Irwin gave his drawing, which contained some dimensional information, to Michael Swanson to work from, and, at some point, Swanson "came to think" the drawing might have been of Plaintiff's StarJet burner (Tr. at 760, 1107-11, 1116-19). Michael Swanson testified he now believes the drawing "was probably a Hauck StarJet drawing" (Tr. at 1110). Swanson testified he mentioned his concerns to his father, Malcolm Swanson, but claimed he could not recall his father's reaction or whether Astec took any action as a result (Tr. at 1112-14). Malcolm Swanson testified his son's description of the document did not sound like a manufacturing drawing (*i.e.*, no title block, no border, no confidentiality stamp), so he "wasn't real concerned about it" (Tr. at 2275, 2324, 2327, 2479-83). In any event, Feese testified Astec's attempt at an open-fired burner, the FlameJet, was "for all intents and purposes . . . a copy of" Plaintiff's StarJet burner (Tr. at 1279-82). Plaintiff does not appear to have ever offered proof as to exactly which drawing Irwin "looked at" nor does Irwin seem to recall whether he ever used that drawing in any particular way (*see* Tr. at 759-60).

Everyone seems to agree the hand drawings Irwin prepared for Michael Swanson depict an open-fired burner very similar to the StarJet, but this fact, in and of itself, does not establish a misappropriation claim beyond all dispute. Viewing the whole of the evidence in the light of the remainder of the case, it would not necessarily have been unreasonable for the jury to conclude Plaintiff had failed to meet its burden with respect to Irwin's apparent use of some unidentified StarJet drawing in some unidentified manner.

Plaintiff also offered evidence of dealings between Astec and Frank T.Y. Sun as direct proof of misappropriation. After using the modified Delevan nozzle on early versions of the WhisperJet, Astec later replaced that nozzle with one designed and developed by Sun and his company, Sun Technology, Inc. In February 2002, Sun contacted Irwin about the possibility of Astec using his nozzles in the WhisperJet (Exh. 2406; Tr. at 785, 936-37, 2830-32). Previously, Sun had worked on an unpaid basis with Plaintiff in testing on the EcoStar II several different "general industrial application" nozzles which he had designed based upon EcoStar II specifications, but Astec ultimately rejected Sun's nozzles (Exhs. 1125, 1126, 1139, 1142; Tr. at 1232-34, 1425-26, 2792-2807, 2811-20, 2866-72, 2873-83, 2885-95). On October 26, 1999, Sun signed a confidentiality agreement with Plaintiff which enabled Sun to gain access to emissions data regarding tests on other nozzles tested on the EcoStar II (Exhs. 2312, 4008; Tr. at 1234, 2821-27, 2893-94). Sun testified he never used the emissions data provided by Plaintiff pursuant to the confidentiality agreement in designing any future nozzles (Tr. at 2828). Sun claims the "double mixing" nozzle which he patented and offered to Astec was developed more than a year after his work with Plaintiff had concluded, this nozzle was different from the "venturi" nozzle he had tested on the EcoStar II, and Plaintiff had not been involved in the design, development, and testing of that nozzle in any way (Tr.

at 2828-45, 2858-62, 2914).  Sun further testified it was actually one of Plaintiff's employees, Ray Baum, who suggested he contact Irwin and Astec about using this new nozzle (Tr. at 2831-32). Feese admitted the particular Sun nozzle Astec ultimately used on the WhisperJet was never itself tested on the EcoStar II but maintained it was his belief "there are a lot of design features [on that nozzle] which came from input provided by [Plaintiff]" (Tr. at 1426).  Sun and Irwin both denied this allegation (Tr. at 788, 2828-45, 2858-62, 2914), but Plaintiff pointed out that before testing his nozzle in the WhisperJet, Sun did not obtain specifications from Astec or have to redevelop his nozzle (Tr. at 2872).  Further, when one of Sun's nozzles did not work very well initially, Irwin was able to improve its stability and performance by "machining out a Hauck atomizer," though Irwin claimed this was done only for the sake of expediency (Exh. 1086; Tr. at 789-91).  In any event, Astec and Sun worked together over a period of approximately a month before Astec began selling WhisperJets with Sun nozzles (Tr. at 792-94, 2843-44, 2895), and Astec appears to have continued testing and adjusting the Sun nozzle to one degree or another for an additional three months (Exhs. 1086, 1090, 1117, 2397, 2437, 2544-49; Tr. at 1422, 2911-13).

Moreover, even assuming Sun had somehow misappropriated one or more of Plaintiff's trade secrets in developing his "double mixing" nozzle, neither Astec nor Irwin could be held liable for that misappropriation unless Plaintiff could prove they knew or had reason to know Sun had done so.  *See* Tenn. Code Ann. § 47-25-1702(2).  It appears undisputed Sun initiated the contact with Irwin and Irwin specifically testified Sun had told him his nozzle had resulted from work with North American Manufacturing (Tr. at 936).  Plaintiff did introduce an e-mail from Irwin to Andrew Hobbs, an Astec engineer, which could be read as implying Irwin understood Sun's nozzles to have been developed for the EcoStar project:

> I hired [Sun] years ago to work with us at Hauck to develop nozzles for the Ecostar he actually has developed 3 different ones, that Hauck has decided not to use. He claims they are superior to the Hauck nozzles in every way. . . . .We'll see . . . .

(Exh. 1117). However, this e-mail is ambiguous and subject to at least two different interpretations. In addition to Plaintiff's take on Irwin's words, the e-mail could just as easily be understood as Irwin providing historical background for his knowledge of Sun's abilities, communicating that Sun had first offered his new nozzles to Plaintiff but they had not expressed any interest, and relaying Sun's claim to have a nozzle superior to the one Astec was presently using in the WhisperJet (*i.e.*, one of Plaintiff's nozzles). As such, the Court finds it would not have been unreasonable for the jury to credit Sun's adamant testimony as to the independent development of his "double mixing" nozzle nor would it have been unreasonable for the jury to conclude Plaintiff failed to prove the necessary knowledge on the part of Irwin and/or Astec.

Additionally, Plaintiff offered several documents as direct proof of misappropriation of Plaintiff's financial trade secrets, including a January 27, 2001 letter from Irwin to Malcolm Swanson (Exh. 1006), an April 12, 2002 memo from Irwin to Swanson (Exh. 1067), and two internal Astec documents relating to cost and pricing data for the WhisperJet (Exhs. 1020, 1068). In the first of these documents, the January 27, 2001 letter, Irwin sets out the terms and conditions of his proposed employment with Astec, offers alternative strategies for Astec to pursue in developing its own burner, and details material and labor/personnel needs and anticipated costs by, in part, referencing EcoStar and StarJet data (Exh. 1006; Tr. at 211-20, 464-76, 634-35, 690-95, 706-18, 1872-74). This letter followed in the wake of a January 16, 2001 meeting between Irwin and senior Astec executives, after which Plaintiff claims Irwin accessed certain of Plaintiff's internal computer files containing parts, prices, costs, and profit margins (Exhs. 1007, 1030; Tr. at 221-24, 481-82),

which he then used to draft his letter. Marino testified this information could not have been derived from the collection of financial information Plaintiff had made available to Astec and/or the general public in the past (Tr. at 553-54) but also conceded "there's nothing that specifically is printed out on that sheet that goes to that letter directly" (Tr. at 224). Both Brock and Malcolm Swanson denied asking for this information, giving it any thought, or using it in any way (Tr. at 1797-1800, 2054-55, 2389-91, 2431, 2433, 2437). Brock in particular emphasized he was going to proceed with a burner project with or without Irwin (Tr. at 1775, 1827-28). More significantly, however, Irwin testified his labor cost estimate had not come from Plaintiff's information but rather arrived at his figures based upon Astec's own needs and labor costs combined with knowledge that was "in [his] head" about the materials and labor hours needed to build a burner based upon his experience (Tr. at 694-96). The April 12, 2002 memo from Irwin to Swanson contains similar information and therein Irwin sets out estimated costs for the WhisperJet and explicitly compares them to Plaintiff's labor costs, material costs, and selling prices for the EcoStar II (Exh. 1067; Tr. at 271-75, 697-700, 1924-26). Brock and Swanson generally claimed such information, even if it had been kept secret by Plaintiff, had no independent economic value since labor hours and costs are calculated differently from company to company and also vary based upon the type of machinery used and the facilities available (Tr. at 1797-98, 2391-92).

Finally, Plaintiff pointed to two Astec internal documents Marino claimed indicate Astec based its WhisperJet pricing strategy upon the EcoStar II pricing information it had obtained through Irwin (Exhs. 1020, 1068; Tr. at 261-66). The first of these documents contains a number of tables detailing the costs of various WhisperJet models and proposed selling prices along with references to a "Hauck purchsed [sic] cost" and a "Hauck selling price to a user" (Exh. 1020), while the second

provides descriptions of WhisperJet models, options, and prices along with a figure representing the "Equivalent Hauck Selling Price to End User" (Exh. 1068). Marino demonstrated to the jury how Astec could have calculated the "Hauck selling price to a user" from information found in the materials Irwin had taken, specifically Plaintiff's master discount schedule and testified the "Flametec proposed selling price" appeared to have been set exactly 5 percent lower than Plaintiff's (Exh. 1020A; Tr. at 261-64). However, Astec pointed out the number could have just as easily been derived directly or by inference from information Plaintiff had given directly to Astec in the past (Exhs. 2149, 2163; Tr. at 448-51, 455-60). As noted previously, when challenged by Plaintiff, Swanson was unable to calculate the precise multiplier from the price data made available to Astec and introduced into evidence (Tr. at 2406-10) but maintained the full complement of information disclosed by Plaintiff would have permitted such a calculation (Tr. at 2477-78).

The remainder of Plaintiff's evidence of misappropriation was less direct and more inferential. Specifically, Plaintiff pointed to the size and relative inexperience of Astec's burner development team, the speed with which Astec's burner program proceeded, the alleged paucity of Astec's developmental file, and the similarities between the WhisperJet and EcoStar II burners, asking the jury to infer misappropriation from the surrounding facts and circumstances. As to the personnel composition of Astec's burner group, Irwin testified the WhisperJet design development team was initially comprised only of himself and Joseph Unjakoti, an Astec employee with no prior experience in burner design (Tr. at 732-33, 1034-35). However, Astec soon added two shop technicians in September 2001 (Russell Fountain and Kelly Knight), Michael Swanson joined the group in January 2002, two more individuals were added in 2002 once full production commenced, various other Astec employees and departments helped in specific ways, and Malcolm Swanson

oversaw and was an active participant in the project throughout (Tr. at 894-909, 958-61, 1044, 1060-61, 1073-76, 1083-84). Fountain had prior work experience involving combustion processes but not burner design or asphalt burners specifically (Tr. at 2486-2500, 2588-89, 2636-37), and Malcolm Swanson had experience with Astec's prior foray into burner design and development for All American. Irwin, however, was the only individual involved with the WhisperJet project who had any prior experience in developing and designing an oil *and* gas burner for the asphalt industry (Tr. at 1019-20). Plaintiff also noted Irwin is not a licensed engineer nor does he hold a college degree in engineering. Although Astec was not in the business of designing and manufacturing burners prior to hiring Irwin, Astec's burner team was not quite a one-man operation, and it should be noted Astec did have considerable experience with the use and maintenance of burners as they were a central component of one of its primary products. Whether or not one could conclude Astec and its burner personnel were capable of developing a functioning burner, especially in the time in which its burner was produced and with the expense and research it expended, is largely a jury question. It certainly would not be unreasonable for a jury to conclude Astec and its burner personnel were not capable of developing a functioning burner and it would not be unreasonable for a jury to conclude Astec and its burner personnel were capable of developing a functioning burner, though it might be reasonable to conclude it might take them a bit more time and expense.

As to the speed of Astec's progress, Irwin testified the project which ultimately resulted in the WhisperJet commenced in late July or early August of 2001, design and fabrication work was completed and prototype testing began on October 26, 2001, the first model was sold on or about November 30, 2001, a model ready was displayed at the CONEXPO in March 2002, and final testing was completed on or about June 6, 2002 (Exhs. 1063, 1064, 1065, 1090, 1095; Tr. at 733-44,

30

768-72, 911-14, 1020-22). Brock testified he sold the first WhisperJet model in November 2001 before the development of the prototype had been completed, which he claimed was consistent with Astec's past history (Tr. at 1802-04). By comparison, the EcoStar took six years to develop and the EcoStar II took a little less than two years (Tr. at 1020). Feese opined it was not possible for Irwin and Astec to have designed a burner like the WhisperJet from scratch according to the time frame and schedule they claimed (Tr. at 1269-70). Astec's controller, Robin Leffew, testified as to the extent and nature of Astec's capital expenditures during 2001 and 2002 for the burner group and its research and development expenditures through June 30, 2003, which she claimed amounted to $1,716,756.29 (Exh. 2841; Tr. at 2667-76). Plaintiff pointed out the "research and development" portion of this figure ($884,567) might be more akin to a statement of the burner department's total expenses since it includes such things as service work on burners in the field, which would not typically be considered "research and development" expenses (Tr. at 2693-2709). Leffew also testified Astec had broken even on the WhisperJet in terms of manufacturing cost but had, in fact, actually lost money taking into account general administrative costs associated with selling the burner (Tr. at 2676-83, 2709-10). Nonetheless, Leffew conceded the WhisperJet project had been a "good investment" for Astec over the course of its first two years (Tr. at 2710). The speed with which Astec was able to develop a prototype, begin selling burners, and enter into production is so remarkable that it is troubling, especially in light of Astec's repeated claim it intended to build a burner from scratch. Such suspicious circumstances, standing alone, might or might not be enough to support a verdict in Plaintiff's favor, but Astec's apparent efficiency clearly buttresses Plaintiff's claims in light of its other evidence.

With respect to the documentation of Astec's burner development program, Marino and

Feese compared Plaintiff's EcoStar II manufacturing drawings with Astec's WhisperJet drawings and found a great number of the drawings were either identical or very similar aside from minor dimensional variations (Tr. at 267-70). Additionally, Plaintiff pointed to the fact Astec did not prepare a business plan in connection with the establishment of its burner group (Tr. at 2663-64). Leffew, Astec's controller, testified Astec had never previously done so when it commenced building things it had previously purchased from other companies; but the examples she gave mostly were of situations where Astec had acquired a company rather than undertaken to start production on its own, and Leffew had herself previously testified she would have expected to have seen a business plan (Tr. at 2663-65, 2688-90). Further, approximately ninety-nine drawings appear to be missing from Astec's database of Flametec drawings (Exh. 1039; Tr. at 1048-54, 1097-1100). Unjakoti testified these drawings were deleted because the parts they depicted did not work and Astec had not yet converted to an automatic database system (Tr. at 1048-54). Michael Swanson testified Astec "commonly" deleted a drawing "when it had outlived its usefulness" but could not recall ever seeing a specific drawing being destroyed previously (Tr. at 1098-1100). Michael Swanson additionally testified Astec began using this particular database system "sometime shortly after" he arrived in January 2002 and only those drawings which were still in use were entered into the current database (Tr. at 1140-41). Although there appears to be some reason to find the scope and content of Astec's documentation suspicious, Astec was able to offer plausible explanations for many of the shortcomings pointed out by Plaintiff.

Plaintiff's independent expert, Professor Domenic Santavicca, testified the development processes reflected by Plaintiff's EcoStar II files and Astec's WhisperJet files "certainly weren't comparable by any stretch of the imagination" (Tr. at 1467). Specifically, Santavicca testified he

saw "almost no evidence" of a design process in connection with the WhisperJet, no discussion of choices, and no analysis (Tr. at 1468-70). Astec challenged this assertion by attempting to recount and document the testing which was performed, the data collected, the progressions through which the project moved, and the discussions and experimentation that occurred (Exhs. 2406, 2415, 2437, 2438, 2439, 2480, 2483, 2495, 2513, 2576; Tr. at 2205-15, 2222-32, 2293-95). Irwin, Unjakoti, Michael Swanson, Malcolm Swanson, and Russell Fountain (Astec's chief service technician for burner group) all testified in some extended detail about the burner development process at Astec, the objectives that drove that process, the general course of the project, their own particular tasks and duties, the problems and obstacles encountered, the solutions developed, testing procedures, and the trial and error process in general (Tr. 1122-39, 2500-2582, 2591-2608, 2637-41). Specifically, Fountain testified the burner group worked an "enormous amount of hours" and the members of the team were each given a wide range of "freedom . . . to try new ideas" and offer their own input (Tr. at 2514). In fact, testing and development appears to have continued up until shortly before the preliminary injunction entered by the Court on August 26, 2003 (Exhs. 1112, 1207; Tr. at 2350-55). Malcolm Swanson also testified Irwin's design style and/or approach is freer and more like "art" than his own (Tr. at 2296-97, 2303-04), suggesting this might account for the character of the WhisperJet developmental files.

Plaintiff's primary asserted basis for an inference of misappropriation were the number and nature of the similarities between the WhisperJet and EcoStar II. Plaintiff contended the "flame trains"[12] of the EcoStar II and the WhisperJet are virtually identical. In support of this claim, Feese

---

[12]Feese conceded the term "flame train" is not one commonly used in the industry but was coined for the purpose of this litigation to denote "the essential components or decisions . . . that need to go into designing a burner" (Tr. at 1189). However, even though not a term of art, this

created a list of the "major burner design decisions" or "major fundamental engineering decisions" one must make in creating a burner (*i.e.*, oil atomization and burner nose, fan design, and flame stabilization/shaping) and testified that at each of these points (and the various subdivisions thereunder) Astec made exactly the same design decision as Plaintiff had with the EcoStar II (Exh. 1285; Tr. at 1194-1212, 1238-57, 1415-21). Feese also went through the entire "flame train" of the two burners and testified each of the EcoStar II design choices with respect to the damper, transition, primary, secondary, and tertiary airstreams, jacket, manifold front, manifold rear, and heat shield were all interrelated; Plaintiff considered that interrelationship to be proprietary and confidential information; Plaintiff derived economic value from that information; and Plaintiff made efforts to keep it secret (Tr. at 1258-67). Feese claimed there were no "material differences" in the functionality or performance of the "flame trains" of the EcoStar II and WhisperJet and, in terms of form fit, and function, the two burners are "extremely close, if not identical" (Tr. at 1266, 1270-71). Similarly, Santavicca testified the basic design concepts of both burners "were virtually the same," their performance is "very similar," and he was unable to identify any "meaningful difference" between the two (Tr. at 1470-72, 1520-21).

Irwin pointed to the WhisperJet's castellated ring, fixed spin vanes, and use of a high-pressure compressed air nozzle as distinguishing features (Tr. at 797-803, 808). Malcolm Swanson conceded the "back end" (*i.e.*, blower, damper, and transition) of both burners is "essentially the same," but identified several distinguishing characteristics of the WhisperJet such as the arrangement of the compressed air and fuel oil tubes, the lack of back plates for secondary and

---

concept is sound and greatly aids in understanding the design and engineering concepts and choices involved in burner development.

tertiary air passages, the use of axial spin vanes, the location and structure of the tertiary air stream, the presence of fixed tertiary air spin vanes (resulting in lack of a linkage arm), the location of the burner front end flange, the width of the secondary air tube, the positioning and lack of notches on the back side of the gas injection tubes, the location and structure of the cooling air stream, the lack of a choke ring, the use of a diverging cone, the layout of the heat shield radiation plates, the nature of the nozzle, the angle of the pintle on the nozzle, the positioning of the nozzle relative to the primary air tube, the relative position of the primary and secondary air tubes, and the use of air diverter castellated rings (Tr. at 2130-88). Swanson personally compiled a list of "representative differences" between the WhisperJet and EcoStar II (Exh. 2100; Tr. at 2264–66). Swanson also described in detail the differences he perceived in the dynamics of the air flow in the two burners and the effects on their performance (Tr. at 2364-74).

Astec's expert, Thomas McGowan, opined that while the EcoStar II and WhisperJet have some design features in common, there are "significant, fundamental, and drastic" differences between the two burners, the most significant of which McGowan identified as the airflows, the cone at the front of the burner, and the castellated rings (Tr. at 2932, 2943-57, 2961-68, 3139). McGowan testified many of the shared elements of the two burners are long-standing, established concepts commonly appearing on burners throughout the industry and dictated by application (Tr. at 2932-43), though he conceded at least "some" of the commonalities were not dictated by application (Tr. at 3053). McGowan also conceded the early versions of the WhisperJet had even more similarities to the EcoStar II (e.g., modified Delevan nozzle, concentric oil and air piping, adjustable tertiary spin vanes) (Tr. at 3054-59).

Both Feese and Santavicca conceded there were differences between the two burners, but

Feese claimed none of those differences had any material impact on the function or performance of the burner (Tr. at 1270-78, 1436-39) and Santavicca opined there was no "justifiable or defensible explanation for those differences" in terms of function or performance, and, in any event, there is no evidence or reason to believe they resulted from a deliberative design process (Tr. at 1472-85, 1503-21). Specifically, Santavicca claimed there was no proof the castellated ring on the WhisperJet produced enhanced stability, mixing, or flame shaping (Tr. at 1474-77, 1518-19); disputed Astec's representation of the effects of the WhisperJet's converging cone and stated that to the extent the converging cone did have an effect it was "very, very comparable" to that of the diverging cone on the EcoStar II (Tr. at 1477-85, 1506-11); and opined there is no "fundamental difference" between the WhisperJet's axial swirl vanes and the EcoStar II's radial swirl vanes with respect to their effect on the combustion process (Tr. at 1511-13). Santavicca further testified he could find no rationalization in the WhisperJet files for at least one design element of that burner which was the same as the EcoStar II, that is the use of three separate air flows (primary, secondary, and tertiary) (Tr. at 1514-16).

Plaintiff also pointed out early WhisperJet models had adjustable vanes just like the EcoStar II, and, in fact, this feature (along with Plaintiff's modified Delevan nozzle) was being actively promoted by Astec as late as the CONEXPO in March 2002 (Exh. 1187; Tr. at 2608-13, 2620-21). Additionally, Feese resisted Astec's characterization of the current WhisperJet's spin vanes as "fixed" since it appeared Astec had changed the spin angles on the WhisperJet during development and also on models in the field (Tr. at 1312-15). However, Fountain's testimony appears to explain why the WhisperJet's "fixed" spin vanes are, of course, still adjustable, but it is simply a much more complicated process requiring a service visit by Astec (Exh. 1115; Tr. at 2622-30, 2641-50). In his

testimony Feese at least impliedly conceded the general point advanced by Astec, that is freely adjustable spin vanes leave open the possibility an operator might select a spin setting that would damage the drum of the operator's combustion system and, at least in some cases (*i.e.*, Astec's), none of the published settings on the EcoStar II might work quite right with the size of the operator's drums; thus, employing fixed vanes geared to the size and internal structure of the operator's drum would not be an insignificant design change since it would remove any guess work and avoid the risk of burn or noncompatability (Tr. at 1312-15, 1337-49, 2135-36).

Plaintiff and Astec each challenged the purported bases for the opinions of the other's independent expert and were both able to point to shortcomings in the investigations and/or analysis performed by the purported experts. Specifically, Santavicca appears not to have performed any tests or experiments to verify his hypotheses but rather based his opinions upon his general knowledge of fluid mechanics and the documentation (or lack thereof) of the WhisperJet and EcoStar II development processes (Tr. at 1526-29). McGowan appears to have conducted a slightly more extensive investigation than Santavicca including some field observations, testing, and calculations (Tr. at 2928-30) but mostly focused on current configurations, did not independently interview individuals on Astec's design team (Tr. at 3009-12), and did not test each of the claimed differences between the burners to determine which, if any, affected burner performance (Tr. at 3067-69). Plaintiff also challenged the thoroughness of McGowan's testing/calculations, the credibility of the individuals upon whom he relied in his investigation, and McGowan's own independence. The Court finds strengths and weaknesses in the testimony and opinions of both Santavicca and McGowan, thus it would not be unreasonable for the jury to favor either one over the other or give their respective testimonies equal weight. Further, the Court also finds ample basis

for a conclusion the WhisperJet and EcoStar II are remarkably similar in some fundamental ways. Whether they are so similar as to justify an inference of trade secret misappropriation is much less certain and reasonable juries could reach differing conclusions.

Plaintiff also sought to buttress the inferences to be drawn from the evidence discussed above by pointing to other dubious facts. Plaintiff elicited testimony from Irwin admitting that when Astec first placed the WhisperJet on the market, Astec's sales people had relied to some degree upon Plaintiff's sales literature and service catalogs for the EcoStar II (Tr. at 794-96). Irwin testified there was initially some confusion in the marketplace and even among Astec's own sales force as to whether Astec was selling an EcoStar burner or something else (Exh. 1066; Tr. 796, 806). Irwin also admitted that when he developed the WhisperJet service and instruction manual he relied upon original EcoStar materials as a guideline and conceded some of the material was identical (Exh. 1185; Tr. at 796-97, 809-12). Further, Plaintiff gave much emphasis to the absence of certain evidence. Despite discovery requests, Irwin's ex-fiancée's home computer was never produced for inspection by Plaintiff, and it appears the computer was eventually damaged.[13] Based on the failure to produce the computer, the Court instructed the jury they could infer any evidence which might have been obtained from that computer would have been unfavorable to Irwin (Charge to the Jury, p. 17).

Plaintiff maintains it presented proof on each element of its trade secret claim, Astec's rebuttals of that evidence were either non-existent or not credible, and "the clear weight of the

---

[13]The evidence at trial indicated Irwin copied Plaintiff's technical and financial information onto this laptop computer for no clearly discernible reason. Irwin had a laptop computer supplied to him by Plaintiff and a desktop computer at his office. During the course of discovery and at trial, Irwin offered a series of different and conflicting explanations as to why the laptop computer could not be produced.

evidence presented at trial unwaveringly points to a finding that all three defendants misappropriated technical and commercial trade secrets" (Court File No. 330, p. 11). In general, Astec admitted Irwin had engaged in some degree of wrongdoing in the general sense but maintained it never knew of, authorized, encouraged, or condoned his actions and, in any event, received no tangible benefit from those actions. Further, Astec claimed the great majority of the trade secrets Plaintiff sought to protect were not, in fact, secrets in light of their ready availability to others in the industry, the loose manner in which Plaintiff handled its purportedly confidential information, and the particular course of dealing between Plaintiff and Astec. As reflected by the Court's extensive recount of the evidence above, Plaintiff's evidence was voluminous and could reasonably be characterized as strong. However, much of Plaintiff's case asked the jury to make certain inferences in order to conclude Astec and/or Irwin had misappropriated its trade secrets. The one aspect of Plaintiff's case which rested squarely upon direct and largely undisputed evidence related to the modified Delevan nozzle, but contrary to Plaintiff's contentions, it would not have been unreasonable for the jury to find Astec's reverse engineering claims credible. A jury verdict in Plaintiff's favor would certainly have been reasonable and perhaps even more reasonable than the verdict ultimately returned by this jury. However, viewing the case as a whole, assessing each of the witnesses' credibility, and examining the content and detail of their testimony, the Court is unable to conclude the jury's verdict is a "seriously erroneous result," *see Holmes*, 78 F.3d at 1046-47, or runs contrary to the "clear weight of the evidence." *See J.C. Wyckoff*, 936 F.2d at 1487 (stating a jury's verdict "should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable"). Accordingly, the Court will **DENY** Plaintiff's motion for a new trial with respect to its claims for misappropriation of trade secrets.

## 2. Intentional, Fraudulent, Malicious, and/or Reckless Nature of Irwin's Breach of His Duty of Loyalty

Plaintiff further claims the jury's verdict with respect to the scienter associated with Irwin's breach of his duty of loyalty was against the clear weight of the evidence (Court File No. 330, p. 15). The jury found Plaintiff had proven by a preponderance of the evidence Irwin had breached his duty of loyalty to Plaintiff (Court File No. 325, ¶ 5) but concluded Plaintiff had not proven by clear and convincing evidence Irwin had done so intentionally, fraudulently, maliciously, or recklessly (*id.* ¶ 6). This second finding is the standard for awarding punitive damages under Tennessee law. The evidence presented at trial undisputedly showed Irwin had set up his own company for the purpose of performing service work for one of Plaintiff's long-standing clients, All American Asphalt, all while still employed by Plaintiff and without Plaintiff's knowledge or permission. Plaintiff introduced into evidence an invoice and field test report from a company called "Irwin Combustion" for service work done in May 2001 for All American (Exhs. 1008, 1009, 1351; Tr. at 228-32, 656-58) and similar documents relating to Irwin's dealings with All American in May and June 2001 (Exhs. 1011, 1012, 1033, 1354; Tr. at 233-34, 658-61). This was work normally performed by Plaintiff for All American and any payments for this work should have gone to Plaintiff and not Irwin. Additionally, Plaintiff introduced a letter, dated May 18, 2001, from Irwin to All American recounting the work that had been performed for All American and indicating he would provide All American with one of Plaintiff's computer programs to use in connection with their burners (Exh. 1048; Tr. at 235-38). Irwin admitted it was wrong to have made consulting visits to All American in May and June 2001 while he was still employed by Plaintiff (Tr. at 1005-06 ("it was wrong and I made a mistake")). Further, Irwin negotiated with Astec for the right to perform such services for

All American once he was employed there and testified if Astec had not agreed to let him do so, he would not have continued with his consulting business (Tr. at 675-76). As such, Irwin effectively admitted he knew exactly what he was doing and that he needed his employer's permission to do it. Therefore, it was unreasonable for the jury to conclude Irwin's actions in breaching his duty of loyalty were not at a minimum intentional and fraudulent, at least with respect to his consulting for All American while still employed by Plaintiff. Accordingly, the Court finds the jury's answer to Question 6 on the verdict form was contrary to the weight of the evidence and the Court will **GRANT** Plaintiff's motion for a new trial with respect to the intentional, fraudulent, malicious, and/or reckless nature of Irwin's breach of his duty of loyalty to Plaintiff.

### 3. Tortious Interference / Unlawful Procurement

Finally, Plaintiff contends the jury's verdict on Plaintiff's claims for tortious interference with and unlawful procurement of breach of Irwin's conflict of interest agreement was also against the weight of the evidence (Court File No. 330, pp. 15-16). In Tennessee, the common law action for tortious interference with contract and the statutory action for unlawful procurement of breach of contract, *see* Tenn. Code Ann. § 47-50-109, have the same elements and operate as alternative theories of recovery. *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 359 (Tenn. Ct. App. 1999). In order to recover on either cause, Plaintiff was required to prove by a preponderance of the evidence (1) there existed a conflict of interest agreement between Irwin and Plaintiff; (2) Astec had knowledge of that agreement; (3) Astec intended to cause or bring about a breach of the agreement; (4) Astec acted maliciously; (5) the agreement was in fact breached; (6) Astec's conduct was the proximate cause of the breach; and (7) Plaintiff suffered damages as a result of the breach (Charge to the Jury, p. 39). *See Quality Auto Parts Co., Inc. v. Bluff City Buick Co.,*

41

876 S.W.2d 818, 822 (Tenn. 1994); *see also Buddy Lee Attractions Inc.*, 13 S.W.3d at 359.

An essential element of Plaintiff's claim was proof Astec had actual knowledge of the existence of a conflict of interest agreement between Irwin and Plaintiff. Irwin testified that in his meeting with Astec in January 2001, "Norm Smith asked me if I had a noncompete agreement with Hauck, and I told him no, I didn't think so. In fact, I don't think I have any agreements" (TR. at 882). Smith, Brock, and Swanson each generally confirmed this account (Tr. at 1771, 2386). Irwin claims he had forgotten about both the conflict of interest agreement and the confidentiality provisions of his employment agreement with Plaintiff and in the wake of his response to Smith's question about a noncompete agreement, no one ever specifically asked him if he had any such agreements with Plaintiff (Tr. at 882-83, 1008-09). Brock conceded confidentiality agreements were "very common" in the industry but testified he assumed Irwin did not have one based upon his response to questions about a noncompete agreement (Tr. at 1871-72). Swanson testified they had known Irwin to have "always conducted himself, in our relationships, in an upright manner and with integrity," therefore, they saw no reason to disbelieve his statement he had not "signed anything" with Plaintiff (Tr. at 2386-88). Thus, Smith, Brock, Swanson, and Irwin all testified Astec never had any knowledge of Irwin's conflict of interest agreement and, in fact, had a specific to reason to believe no such agreement existed. This is a question of credibility. The jury was entitled to reject this testimony or credit it in its sole discretion. In the light of this consistent testimony from four separate witnesses, albeit all witnesses associated with Astec, the Court cannot conclude the jury was unreasonable in finding in favor of Astec on this claim. Accordingly, the Court will **DENY** Plaintiff's motion for a new trial on its tortious interference and unlawful procurement claims.

**D.    Confusion Resulting From Verdict Forms**

Further, the Court finds the confusion surrounding the submission of the verdict form to the jury does not change any of the above analysis. Plaintiff argues the timing of the jury's deliberations suggests the improper forms had some effect on the jury's decision since the jury had indicated it was close to reaching a verdict but ended up taking an additional four hours to conclude its deliberations after receiving the correct forms (Court File No. 330, pp. 16-17). However, there is no reason to believe the jury was not simply being diligent in reviewing the new forms, rehashing their deliberations, and ensuring their verdict was correctly reflected on the appropriate form. Additionally, Plaintiff made no objection to the submission of the incorrect forms to the jury and has never articulated how this unfortunate mistake resulted in specific prejudice to its case. Therefore, the Court does not find this confusion necessitates a new trial, either independently or in conjunction with Plaintiff's other arguments.

**E.      Jury's Failure to Award Damages for Irwin's Breach of the Confidentiality Provisions of his Employment Agreement with Plaintiff**

Finally, although Plaintiff has not challenged the jury's verdict and award of damages on its claim against Irwin for breach of the confidentiality provisions of his employment agreement, the Court notes an apparent inconsistency between the jury's finding of liability on Plaintiff's breach of contract claim (Court File No. 325, ¶ 4) and award of zero damages (*id.* at ¶ 13). In order to find Irwin liable for breach of contract, the jury was required to find by a preponderance of the evidence (1) there existed a contract between the parties, (2) Irwin breached his duties under that contract, and (3) Plaintiff suffered damages as a result of that breach (Charge to the Jury, p. 35). *See Chadwick v. Spence*, 2004 WL 298367, *5 (Tenn. Ct. App. Feb. 11, 2004) (unpublished opinion); *see also LifeCare Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC, Inc.*, 79 F.3d 496, 514 (6th

43

Cir. 1996). Assuming the jury followed the instructions given by the Court, it is impossible to reconcile the jury's finding Plaintiff had proven its breach of contract claim (which explicitly required a finding Plaintiff suffered damages) with its conclusion no damages resulted from that breach. Accordingly, the Court **ORDERS** Plaintiff and Irwin to file additional briefs within ten (10) days of the entry of the accompanying Order. Such briefs shall state the parties' respective positions as to the sustainability of the jury's answers to Questions 4 and 13 on the verdict form and what, if any, issues should be submitted to a new trial. Following the filing of initial briefs, the parties shall have an additional seven (7) days in which to file a response to the opposing party's brief.

## IV.  <u>CONCLUSION</u>

As the Court suggested earlier, this is a difficult and close case. Reasonable jurists could easily come to different conclusions. An appellate court reviewing this matter might well reach a different conclusion. However, this Court has always been hesitant to set aside a jury verdict. The genius of our jury system requires that we place our confidence in the collective decisions of lay people selected at random from a cross section of the community. In doing so we must accept that on occasion these lay people will make decisions that may differ from those of judges or those trained and experienced in the law. For this Court, setting aside a jury verdict is never to be done lightly.

For the reasons stated above, the Court will **GRANT** Defendants' joint motion to exceed the page limit (Court File No. 347), **GRANT** Astec's motion to file a late exhibit (Court File No. 349), **GRANT IN PART** Plaintiff's motion for a new trial (Court File No. 329) with respect to the intentional, fraudulent, malicious, and/or reckless nature of Irwin's breach of his duty of loyalty to

Plaintiff, and **DENY IN PART** Plaintiff's motion for a new trial (Court File No. 329) with respect

to Plaintiff's claims for misappropriation of trade secrets, tortious interference with contract, and

unlawful procurement of breach of contract. Additionally, the Court will **ORDER** further briefing

with respect to the sustainability of the jury's verdict on Plaintiff's claim against Irwin for breach

of the confidentiality provisions of his employment agreement.

An Order shall enter.


                **/s/**
          **CURTIS L. COLLIER**
    **UNITED STATES DISTRICT JUDGE**